# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BYRON T. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV 14-454-RAW-SPS |
| | ) | |
| CORRECTIONS CORPORATION | ) | |
| OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This action is before the Court on Defendants' motion for summary judgment. The Court has before it for consideration Plaintiff's second amended complaint (Dkt. 59), Defendants' motion (Dkt. 84), and Plaintiff's response to the motion (Dkt. 94).

Plaintiff is a pro se prisoner in the custody of the Oklahoma Department of Corrections who is incarcerated at Oklahoma State Penitentiary in McAlester, Oklahoma. He brings this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations during his incarceration at Davis Correctional Facility ("DCF"), a private prison located in Holdenville, Oklahoma. The defendants are Corrections Corporation of America and the following DCF officials: Warden Wilkinson; James Sanford, R.N.; Anna Newton, L.P.N.; Cynthia McGehee, R.N.; Ray Larimer, R.N., DCF Clinical Supervisor; and Correctional Officer E. Wornell. Defendants Kathy Miller and Dr. Mark Reiheld previously were dismissed from this action (Dkt. 72).

### Plaintiff's Allegations

Plaintiff alleges that on Friday, February 22, 2013, he experienced sudden pain in his testicles and lower stomach and throughout the joints in his body. He complained to his correctional counselor who called the facility's medical clinic while Plaintiff lay on his cell

floor in the fetal position. Because he was unable to walk unassisted, Plaintiff was taken in a wheelchair to the clinic where he had contact with Defendants Nurse Sanford and DCF Clinical Supervisor Larimer.[1] Plaintiff told Sanford and Darius Butler, an inmate orderly, that he had pain which had started as "blue balls" but had gotten worse. Sanford and Butler laughed at him. (Dkt. 59 at 2, 9; Dkt. 94 at 2; Plaintiff's Deposition, Dkt. 94 at 43, p. 70).

Sanford asked Plaintiff some questions, but did not perform a physical examination. Sanford then gave Plaintiff an injection and placed him in a medical holding cell for five or more hours to await the doctor. Plaintiff vomited twice in the cell, and Defendant Correctional Officer E. Wornell and the orderly cleaned it up. Plaintiff asserts he was left screaming in pain, in the fetal position on the floor, and no one came to check on him until the next nursing shift. (Dkt. 59 at 2-4, 9; Dkt. 94 at 2-3, 11, 19; Plaintiff's Deposition, Dkt. 94 at 31, p.43).

After the next nursing shift started, Plaintiff asked Defendant Nurse Anna Newton why the doctor had not come to see him. Newton allegedly told Plaintiff she had forgotten about him and that the doctor already had been there and left. Newton advised that no doctor would be there over the weekend and sent Plaintiff back to his pod in pain. Plaintiff alleges he was in pain throughout the weekend and complained to the pod officer. He was told that nothing could be done, because no doctor was there on the weekend. (Dkt. 59 at 4, 10; Dkt. 94 at 3-4; Plaintiff's Deposition, Dkt. 94 at 31, p. 44-45).

On Monday, February 25, Plaintiff again experienced pain in his testicles and lower stomach, with pain in all his joints. His correctional counselor called the medical clinic, and Plaintiff was seen by Defendant Nurse Cynthia McGehee. When he walked into the medical

---

[1] Plaintiff has submitted an affidavit by Willie Jefferson, stating that on February 22, 2013, Plaintiff was taken from his cell in a wheelchair. (Dkt. 94 at 27).

area, Nurses Sanford, McGehee, and Larimer were "fussing" about Plaintiff's complaints and his having been seen at the clinic on Friday. Plaintiff told McGehee he was in pain, and one of his testicles was larger than the other. McGehee said she was "not looking at him down there." Instead of having a physical examination, a sample of Plaintiff's urine was taken, and he was sent back to his cell without treatment. McGehee also gave him ibuprofen. (Dkt. 59 at 4, 10; Dkt. 94 at 4-5, 22).

The next day, Tuesday, February 26, Plaintiff complained to the correctional counselor on his pod. The medical staff advised the correctional counselor that no doctor was available. (Dkt. 59 at 11; Dkt. 94 at 5).

On Wednesday, February 27, Plaintiff again complained about his pain and was seen by medical staff. He alleges Defendants Sanford and Larimer "fussed" at him again, and Plaintiff assumed they were not taking his medical problem seriously. He was placed in a medical observation cell and examined by Dr. Mark Reiheld about an hour later. Dr. Reiheld diagnosed Plaintiff with possible testicular torsion and had him transferred to Holdenville General Hospital. At the hospital, Plaintiff was given a prescription and instructed to return the next day for an ultrasound diagnosis. (Dkt. 59 at 4, 11; Dkt. 94 at 5-6).

On Thursday, February 28, Plaintiff returned to Holdenville General Hospital for the ultrasound. The physician at the hospital diagnosed him with testicular torsion and advised that his left testicle was "dead" and would have to be removed. In addition, his right testicle was attached to the scrotum. Plaintiff also was told that if he had received treatment sooner, he would have had a better chance to save the left testicle. Plaintiff was returned to DCF and then transferred to the University of Oklahoma Medical Center in Oklahoma City where the diagnosis was confirmed. On Friday, March 1, 2013, Plaintiff's left testicle was removed, and his right testicle was surgically repaired. Plaintiff alleges Dr. Joel Slaton at the OU

3

Medical Center told him that an earlier procedure would have saved his left testicle. (Dkt. 59 at 4-5, 11; Dkt. 94 at 6, 14).

**Motion for Summary Judgment**

Defendants have filed a motion for summary judgment (Dkt. 84). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Eighth Amendment Medical Claims**

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court addressed the Eighth Amendment prohibition against cruel and unusual punishment in the context of medical attention:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citations and footnotes omitted).

Deliberate indifference involves both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner first must produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Id*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (internal quotation marks omitted). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

Defendants allege Plaintiff was not subjected to deliberate indifference of a serious medical need, and there was no actionable denial or delay in providing medical treatment to him. In support of their motion for summary judgment, Defendants have submitted with their motion Plaintiff's medical records and affidavits from the facility staff who were involved in Plaintiff's medical care, as well as an excerpt of Plaintiff's deposition.

Based on the record, the Court finds Plaintiff has shown his medical condition was sufficiently serious. *See Riddle*, 83 F.3d at 1202. Once the facility physician examined Plaintiff, it was determined that he needed additional testing and then surgical treatment. Therefore, the objective component of deliberate indifference has been met. The question is whether the subjective component was met.

**Defendant Corrections Corporation of America**

Defendant Corrections Corporation of America ("CCA") has moved for summary

judgment regarding Plaintiff's Eighth Amendment claims.[2]  CCA owns and operates DCF where Plaintiff was housed pursuant to a contract between CCA and DOC.

Plaintiff alleges that by virtue of its contract with DOC, "CCA has assumed DOC's constitutionally-mandated obligations to provide for the health and safety of those in its custody."  Plaintiff further asserts "CCA is responsible for the training, supervision, and discipline of prison staff regarding all aspects of prison . . . operations, including, but not limited to medical care."  He also alleges CCA is responsible for implementing DOC policies and procedures and the American Correctional Association ("ACA") standards for adult correctional institutions within the facility.  (Dkt. 59 at 7-8).

CCA alleges Plaintiff has failed to demonstrate that an official policy or custom of CCA "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769-71 (10th Cir. 2013) (citations omitted).  *See also Smedley v. Corrections Corp. of Am.*, 175 Fed. App'x  943, 945-46 (10th Cir. 2005) (applying doctrine of *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978), to determine § 1983 liability of a private corrections facility under well-established law).  Plaintiff must show that the policy or custom either directly violated his rights or was the "moving force" behind an employee's violation of his rights.  *Schneider*, 717 F.3d at 770; *Smedley*, 175 Fed. App'x at 946.  "A challenged practice may be deemed an official policy or custom for § 1983 . . . purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a . . . policymaker, or deliberately indifferent training or supervision."  *Schneider*, 717 F.3d at 770 (citation omitted).

---

[2]  Corrections  Corporation  of  America  is  now  called  CoreCivic.  *See* http://www.correctionscorp.com/ (accessed March 22, 2018).

When asked in his deposition, "Why did you name Corrections Corporation of America as a defendant," Plaintiff testified:

> Because they're over the facility that I was at. They're responsible for their employees. They're responsible for their nurses. They're responsible for implementing policy and procedures. They're responsible for inmates' health, medical, safety, all of that. So that's why I named them as defendants.

(Dkt. 84-7 at 8).

Plaintiff has made no allegations in his complaint or his response to the motion for summary judgment regarding a CCA policy that reasonably could be related to a violation of his constitutional rights. He also has not brought a claim challenging a specific CCA policy as unconstitutional. Instead, the only relation between CCA and the alleged violation of Plaintiff's constitutional rights apparently is CCA's ownership of DCF and the employment of DCF staff. The Court, therefore, finds Defendant CCA is entitled to summary judgment.

**Defendant Warden Wilkinson**

Plaintiff alleges Defendant DCF Warden Wilkinson is responsible for supervision of all employees to ensure the safety and well-being of all inmates in the facility. Plaintiff further asserts Warden Wilkinson is responsible for implementing DOC policies and procedures, as well as ACA standards. (Dkt. 59 at 1, 8). Defendant Wilkinson alleges Plaintiff has failed to made any specific allegations against him.

"Personal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (citations omitted). *See also Mee v. Ortega*, 967 F.2d 423, 430-31 (10th Cir. 1992). Plaintiff must show that a defendant personally participated in the alleged civil rights violation. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Supervisory status alone is not sufficient to support liability under § 1983. *Id*. *See also Polk County v. Dodson*, 454 U.S. 312, 325 (1981).

> Liability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference, rather than mere negligence. *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.1992). "[S]upervisory liability requires 'allegations of personal direction or of actual knowledge and acquiescence.'" *Id*. at 1400 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)).

*Langley v. Adams County*, 987 F.2d 1473, 1481 (10th Cir. 1983).

Supervisory liability under § 1983 may not be premised upon a theory of respondeat superior. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider*, 717 F.3d at 767). To succeed on a supervisory liability theory, a plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." *Booker*, 745 F.3d at 435 (quoting *Schneider*, 717 F.3d at 767). To demonstrate that link, "three elements [are] required to establish a successful § 1983 claim against a defendant based upon his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Schneider*, 717 F.3d at 767.

Here, there is nothing in the record indicating Warden Wilkinson had any knowledge of Plaintiff's medical condition or that Wilkinson had any involvement in Plaintiff's medical care. Plaintiff testified at his deposition that he did not see Wilkinson when he was in the facility medical clinic, and he did not know whether Wilkinson was at the facility during the time at issue. (Dkt. 84-7 at 4-6). Instead, Plaintiff argues that because a medical emergency was called on February 22, 2013, the warden was supposed to have been notified pursuant to DOC policy and procedure, and certain forms are supposed to be completed. (Dkt. 84-7 at 5-6; Dkt. 94 at 25). Plaintiff, however, has failed to provide evidence of the referenced policy and procedure. Because Plaintiff has failed to show that Wilkinson personally participated in or was deliberately indifferent to Plaintiff's serious medical condition, Defendant Wilkinson is entitled to summary judgment.

**Defendant Correctional Officer E. Wornell**

Plaintiff alleges in his complaint that Defendant Correctional Officer Wornell was working in the DCF medical clinic on February 22, 2013, when Plaintiff first presented for medical care. Plaintiff claims Wornell "showed deliberate indifference to [Plaintiff's] serious painful medical need. Denied and delayed access acting under color of state law while exercising her responsibilities Pursuant to state law and violating [Plaintiff's] constitutional rights." (Dkt. 59 at 3-4).

According to the complaint, Ms. Wornell and an inmate orderly cleaned up Plaintiff's vomit in the medical observation cell. Plaintiff asserts he was in pain and was screaming throughout the time he spent in the observation cell, as he waited for the doctor. Plaintiff's complaint, however, makes no specific allegation that Wornell violated his constitutional rights, or that Wornell should have taken certain actions related to Plaintiff's medical care. Furthermore, the complaint makes no specific allegations of Ms. Wornell's personal participation concerning Plaintiff's medical condition. (Dkt. 59at 3-4).

"[P]ersonal participation in the specific constitutional violation complained of is essential." *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). *See also Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (citation omitted). Because Plaintiff has failed to show Defendant Wornell's personal participation in the alleged constitutional violations, Wornell is entitled to summary judgment.

**Defendant Ray Larimer**

Plaintiff alleges Defendant Ray Larimer, R.N., DCF Health Services Administrator, was deliberately indifferent to his serious medical needs by denying and delaying treatment. Larimer allegedly was present when Plaintiff arrived in the medical clinic on February 22, 2013, and on February 25, 2013.  (Dkt. 59 at 3-4).

Plaintiff testified at his deposition that he named Larimer as a defendant "because he was there and talked to me--well, initially the 22nd, he was on duty."  Plaintiff acknowledged that Larimer had no intention to harm him.  Plaintiff, however, has identified no other link between himself and Larimer.  (Dkt. 84-7 at 7, 9).

Defendant Larimer states by affidavit that as the Health Services Administrator, he supervises the DCF nurses, licensed practical nurses, and medical records clerks.  He also oversees the scheduling of visits between inmates and the facility doctors and other health care professionals.  He reviewed Plaintiff's medical records, but stated that to the best of his recollection, he "had no direct examination of, contact with, or treatment of" Plaintiff during the period of February 22, 2013, to March 5, 2013. (Affidavit of Ray Larimer, R.N., Dkt. 84-5). The Court notes that Larimer's affidavit contradicts Plaintiff's allegations that Larimer was present when Plaintiff arrived at the clinic on February 22 and February 25, 2013.

Accepting Plaintiff's evidence as true and drawing all reasonable inferences in his favor, *See Anderson*, 477 U.S. at 255, the Court finds Plaintiff's allegations against Defendant Larimer fail to demonstrate the components necessary to state an Eighth Amendment claim.  *See Farmer*, 511 U.S. at 834.  Plaintiff does not make any claims that Larimer was involved to any degree in his medical assessment or treatment.  Furthermore, to the extent Plaintiff may be alleging Larimer acted in a supervisory capacity, there are no facts showing an 'affirmative link' between Larimer and the alleged constitutional violation."

10

*See Booker*, 745 F.3d at 435. Therefore, Defendant Larimer also is entitled to summary judgment.

**Defendants James Sanford and Anna Newton**

Plaintiff alleges Defendants James Sanford, R.N. and Anna Newton, L.P.N. denied him timely and appropriate medical care for his serious medical condition. The record shows Plaintiff first was seen in the DCF medical clinic at 1:52 p.m. on February 22, 2013, by Defendant James Sanford, R.N., who observed and examined him. (Medical Records, Dkt. 84-2 at 2).

Defendant Sanford states by affidavit that Plaintiff's chief complaints were "abdominal pain, nausea, seeing red, pain in joints," as well as cramping, flatulence, and bloating. Nurse Sanford took Plaintiff's vital signs, listened to his bowel sounds with a stethoscope, and felt his abdomen. According to Sanford's treatment notes, the onset was one hour prior to the clinic intake. Plaintiff's bowel sounds were normal, his abdomen was soft, and his urinalysis was normal, indicating no infection or kidney stone. Plaintiff made no complaints of testicular pain at that time. Sanford states he is familiar with testicular torsion, and his observations and examination of Plaintiff on February 22 did not support that diagnosis. Sanford treated Plaintiff's nausea with an injection of Phenergan 25 mg. intramuscularly and placed him in one of the clinic's medical observation cells. Sanford did not believe Plaintiff's condition was emergent. Because Plaintiff had complained of extreme nausea, Sanford believed it was appropriate to monitor him for several hours. The incoming medical staff for the next shift were briefed by Sanford about Plaintiff's complaints and treatment. (Affidavit of James Sanford, R.N., Dkt. 84-3; Medical Records, Dkt. 84-2 at 2-7). Sanford's affidavit does not address Plaintiff's allegations that he was screaming in pain or that Plaintiff had contact with Sanford on February 27, 2013.

Plaintiff alleges in his complaint that while he was in the observation cell, he "was in pain and scream [sic] throughout the time [he] spent in the holding cell waiting for the doctor." (Dkt. 59 at 4). In support of his allegations, he has submitted an affidavit by Darius Butler, the inmate orderly on duty the day he first went to the medical clinic, who states:

> On February 22, 2013, Mr. Watson came to medical. He looked and complained of very serious pain. He was wheelchaired up to medical. Mr. Watson was seen by the medical staff: R.N Mr. Randy Sanford. Mr. Sanford asked myself to come in the exam room. Mr. Watson asked me to leave but Mr. Sanford ordered me to stay, "He might need my assistance." Mr. Watson was complaining of pain in his lower abdominal. Mr. Sanford asked what the pain was like and Mr. Watson said "pain in my lower stomach, groin area, at first he thought it might be blue balls and the pain never stopped." We all laughed after his statement about blue balls. After a short examination by Mr. Sanford, Mr. Watson was placed in a medical cell for further examination by a doctor later in the day. This did (cont.)

(Dkt. 94 at 29).

Defendant Health Services Administrator Larimer states by affidavit that the medical observation cell where Plaintiff was housed on February 22, 2013, is across from the medical records office in the facility's medical clinic, and it is 30-35 feet from the nurses' station. Larimer further states the clinic is not noisy, and any such screaming by Plaintiff would have been heard and addressed by the staff. Larimer's affidavit, however, also claims he was not present during Plaintiff's time at the clinic. (Affidavit of Ray Larimer, R.N., with attached photo of the clinic layout, Dkt. 84-5).

Defendant Anna Newton, L.P.N., states by affidavit that she was on duty for the second/evening shift at the DCF medical clinic on February 22, beginning at 3:00 p.m. During the turnover briefing, Nurse Sanford indicated he had examined Plaintiff, had performed a urine test which was normal, and had administered Phenergan for Plaintiff's serious nausea. Plaintiff was in a medical observation cell to make sure the nausea successfully abated. (Affidavit of Anna Newton, L.P.N., Dkt. 84-6 at 2-3).

Nurse Newton further states that Plaintiff remained in the medical observation cell for the next 3-4 hours. He voiced no complaints during that time. At approximately 6:30 p.m., Rebecka Poole, C.M.A., took his vital signs, which Nurse Newton reviewed and noted as essentially normal. Newton spoke with Plaintiff, and he denied having any pain or discomfort. Newton felt his abdomen, which was soft and not distended. Plaintiff was provided a liquid diet, and he consumed it with no problems. He was advised that he could spend the night in the medical clinic, but he said he preferred to return to his assigned housing unit. Because Plaintiff's vital signs were within normal limits, his nausea had abated, and he denied having any pain, he was released from the clinic at 6:50 p.m. and returned to his assigned housing. (Affidavit of Anna Newton, L.P.N., Dkt. 84-6 at 3; Medical Records, Dkt. 84-2, 8).

Defendant Newton states Plaintiff made no complaints to her about groin or testicular pain. If he had made such complaints, she would have charted them and taken steps to address them. Furthermore, her examination and observations of Plaintiff did not support a medical conclusion of testicular torsion. Newton disputes Plaintiff's allegation that he repeatedly screamed in pain while he was in the medical observation cell and asserts the nursing station is 10-15 steps from the cell he occupied. Because the clinic generally is quiet during the second shift, the staff would have heard any screaming and would have responded and charted the situation. Newton also denies having forgotten Plaintiff while he was in the observation cell, but she does not address whether Plaintiff missed seeing the doctor during that time. (Affidavit of Anna Newton, L.P.N., Dkt. 84-6 at 3-4).

The Court has carefully reviewed the record and construes Plaintiff's pleadings liberally. *See Haines v. Kerner*, 404 U.S. 519 (1972). This relaxed standard, however, does not relieve his burden of alleging sufficient facts on which a recognized legal claim could be

based.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

After consideration of the pleadings and other submitted materials, the Court is of the view that there are no genuine issues of material fact concerning the acts of Defendants James Sanford and Anna Newton.  Plaintiff's allegations do not show deliberate indifference to Plaintiff's serious medical needs as alleged.  Regardless of whether Plaintiff was screaming in the medical clinic, it is clear from the record that medical care was provided there by Sanford and Newton.  Where there is such evidence of a "series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a 'deliberate indifference' to the prisoner's complaints."  *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976).

The record shows that Nurse Sanford took Plaintiff's vital signs and performed a physical examination and urinalysis in response to his reported symptoms.  Sanford also administered Phenergan to treat Plaintiff's extreme nausea.  Plaintiff remained in a medical observation cell for several hours.  When Newton replaced Sanford, the record shows Plaintiff's nausea had abated, which Plaintiff does not dispute.  Newton determined that Plaintiff's vital signs were within normal ranges, and his abdomen was soft and not distended.

Plaintiff disputes Defendant Newton's claim that he consumed a liquid diet.  He also contends she never touched him, so she did not examine his abdomen.  (Plaintiff's Deposition, Dkt. 94 at 32, p. 48).  Plaintiff also denies reporting he was in no pain, and he alleges he was sent back to his housing unit without proper authorization at 6:58 p.m.  (Dkt. 94 at 12).  He does not, however, dispute Newton's statement that she offered to let him stay the night in the medical clinic to continue under observation.  Also, there is no evidence that Plaintiff requested additional medical treatment while Newton was on duty, and he does not

explain why he believes his release was unauthorized.

Regarding Plaintiff allegation that Newton forgot to tell the doctor to see Plaintiff, the Court must consider this claim as true. Plaintiff, however, has alleged at most negligence by Nurse Newton, not deliberate indifference. The negligent conduct of a prison official is, in all cases, insufficient to rise to the level of deliberate indifference. *See Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." (quotations omitted)). "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105-106 (quotations omitted).

Because the Court finds there are no genuine issues of material fact with regard to the treatment of Plaintiff's serious medical condition by Defendants Sanford and Newton, summary judgment is granted for these two defendants.

**Defendant Cynthia McGehee**

Plaintiff alleges Defendant Cynthia McGehee, R.N., was deliberately indifferent to his serious medical needs by denying and delaying an appropriate medical evaluation and access to treatment. Nurse McGehee states by affidavit that on Monday, February 25, 2013, Plaintiff returned to the medical clinic, and she met with him at approximately 2:50 p.m. Plaintiff complained of urinating blood, groin pain, and that one of his testicles was bigger than his other. Plaintiff provided a urine specimen which was negative for blood. Because a corrections officer told Nurse McGehee that Plaintiff said he had blood in his stool, McGehee asked Plaintiff to provide a stool specimen, but he refused to do so. McGehee took Plaintiff's vital signs. His temperature was 99.0°, his respirations were 16 BPM, his pulse ox was 100%, his pulse was 75, and his sitting blood pressure was 133/83. (Affidavit of

Cynthia McGehee, R.N., Dkt. 84-4; Medical Records, 84-4 at 9-14). McGehee's affidavit does not address Plaintiff's allegation that she refused to examine his testicles or have other medical personnel perform an examination in response to Plaintiff's complaint that one testicle was larger than the other.

Nurse McGehee further states in her affidavit that she is familiar with the medical condition of testicular torsion, noting that a patient with this infrequently-occurring condition complains of excruciating pain and has "real difficulty walking." According to Nurse McGehee, Plaintiff did not present in the medical clinic on February 25 in this condition, as he was ambulating without notable difficulty. Based on McGehee's observation and examination of Plaintiff, she concluded he was not in an emergent condition, and she did not suspect testicular torsion. She prescribed two IBU-200 mg. tablets to be taken three times a day for four days. After the conclusion of Plaintiff's examination, Nurse McGehee sent a note to Mark Reiheld, M.D., the facility medical provider. (Affidavit of Cynthia McGehee, R.N., Dkt. 84-4). McGehee has not provided a copy of the note or revealed its content.

Plaintiff disputes McGehee's statement about her knowledge of testicular torsion, because he told her that his left testicle was larger than the right one and that he was in pain. (Dkt. 94 at 22). He has submitted copies of material from http://www.healthline.com/health/testicular-torsion (accessed July 10, 2016), which describes the disorder: "Pain and swelling of the scrotal sac are the main symptoms of testicular torsion. The onset of pain may be quite sudden, and the pain can be severe." (Dkt. 94 at 36). It further states that vomiting may be present, and that "torsion of the testes is a medical emergency." *Id.* at 37. Also, "[d]uring a physical exam, your doctor will check your scrotum for swelling." *Id.* "Surgical repair is usually required to treat testicular torsion. . . . Surgery is performed as quickly as possible to restore blood flow to the testicles. If blood flow is cut

16

off for more than six hours, testicular tissue can die. The affected testicle would then need to be removed." *Id.* at 43.[3]

Two days later, on Wednesday, February 27, 2013, Dr. Reiheld met with Plaintiff at 3:45 p.m. Plaintiff's chief complaint was "5 days of increasing testicular pain. Started with testicular pain and nausea and hs [sic] continued to get worse and worse. No let up in pain at all. No burning on urination. Vomiting the first few days. No vomiting lately. But pain is worse." (Medical Records, Dkt. 84-2 at 15).

Dr. Reiheld examined Plaintiff and charted "tense swelling of entire LT testicular sac with severe tenderness no redness," with an assessment/diagnosis of "possible testicular torsion LT." Dr. Reiheld referred Plaintiff to Holdenville General Hospital emergency room for a testicular ultrasound, and Plaintiff was transported to the hospital where he was seen by Gary Hillman, D.O. The initial diagnosis was epididymitis, and Plaintiff was prescribed Cipro, an antibiotic. The hospital staff scheduled Plaintiff for an ultrasound the next day. Plaintiff was returned to DCF and was given his prescription. He was transported back to the hospital on February 28, and the ultrasound was performed. The ultrasound indicated the presence of a simple left epidymal cyst and no definite blood flow in the left testis, compatible with testicular torsion. The facility physician then directed that Plaintiff be transferred to OU Medical Center. (Medical Records, Dkt. 84-2 at 15-34).

Plaintiff had surgery on March 1, 2013, to remove his left testicle and repair the right testicle. Plaintiff's discharge summary from the OU Medical Center, dated March 1, 2013,

---

[3] The Court considers this online article solely for the purpose of summary judgment and because the defendants have not objected to or disputed the material. *See Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1122 (D. Or. 2014) (denying defendant's objection to plaintiff's citations to Wikipedia articles, because the articles were "not central, and certainly are not essential, to the Court's decision on the motion for summary judgment." Consideration of Plaintiff's online article in the motion for summary judgment now before this Court does not mean that such material would be allowed at trial.

noted a diagnosis of left testicular torsion.  The procedure performed at the Medical Center was a left scrotal orchiectomy and right orchipexy.  The discharge summary also noted that Plaintiff had tolerated the procedure, was in stable condition, and was discharged back into DOC custody.  He was cleared for a regular diet, cautioned to have no straining or lifting greater than 10 pounds for 6 weeks, and Norco pain medication was prescribed for use as needed.  (Medical Records, Dkt. 84-2 at 34-36).

He was released from the OU Medical Center on March 2, 2013 at 1:02 a.m. and returned to the prison facility.  He remained in a medical observation cell in the facility medical clinic until being discharged by Dr. Reiheld on the morning of March 5, 2013, when he was discharged to return to his regular housing unit.  (Dkt. 84-2 at 37-46).

As set forth above, the Eighth Amendment prohibits deliberate indifference to an inmate's serious medical needs.  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  With the objective component of deliberate indifference having been met in this case, the subjective component is met if a prison official knowingly disregards an excessive risk to an inmate's health or safety.  *Id.* (citing *Farmer*, 511 U.S. at 837).  "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm."  *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  *See also Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001).  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citing *Oxendine*, 241 F.3d at 1278).

> A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional. *See, e.g., id.* at 1210 (delay of "several hours" in taking inmate with chest pains to hospital violated Eighth Amendment); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) ("prisoner who suffers pain needlessly when relief is

readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (fifteen-minute delay in treating inmate in cardiac arrest may violate Eighth Amendment).

*Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005)

In *Sealock*, the plaintiff, a prisoner, awoke at 1:30 a.m., "sweating so heavily that his bed and clothing were soaked. He felt unwell." *Id.*, 218 F.3d at 1207. A correctional officer was summoned, and she observed that the plaintiff was "sweating, vomiting and appeared very pale." The plaintiff told the officer that he had crushing chest pain and trouble breathing, and he had been vomiting all night. The officer said there was nothing she could do until someone arrived at the clinic at 6:00 a.m. *Id.* at 1207-08.

As the plaintiff lay in his bed for another hour, his chest pain intensified, and he asked for the officer to return to his cell. The officer appeared in about five minutes with the shift commander. The plaintiff's roommate told the shift commander that the plaintiff was having a heart attack, and the shift commander said there was nothing he could do. No one was at the clinic, it would take an hour to warm up the van, and it was snowing outside. The shift commander offered the plaintiff an antacid, which he declined. The plaintiff testified that the shift commander said to him, "Just don't die on my shift. It's too much paper work." Later, the correctional officer told the plaintiff that she had talked to someone about his condition, and she was advised to give the plaintiff two Tylenol, which she did. She told the plaintiff that he could see the physician's assistant at 6:00 a.m. *Id.* at 1208.

At 6:00 a.m., the plaintiff arrived at the infirmary and told the nurse that he had chest pain and could not breathe. She said he had the flu, and she could not do anything until the P.A. arrived at 8:00 a.m. The nurse noted the plaintiff's complaints and vital signs. The nurse spoke to the P.A. around 8:00 a.m. and read her notes to him. The P.A., however,

testified that the nurse never mentioned chest pain to him over the telephone.  He claimed that if he had been given that information, he would have called an ambulance immediately. *Id.*

Based on the information he received from the nurse, the P.A. ordered her to give the plaintiff a shot of Phenergan, which she did.  She also ordered a lay-in for the rest of the day. The plaintiff stayed in bed until the next day, and he testified "he felt so bad that he thought he was dying."  The next day, he was approved for another 24-hour lay-in, and was told he would be seen at 1:00 p.m.  When he arrived, he told the nurse that "his chest was killing him, he couldn't breathe, and that the pain had traveled into his arms." *Id.*

A second P.A. arrived and administered an EKG.  He advised the plaintiff that there were some changes in his heart and administered nitroglycerin.  The P.A. then called an ambulance.  At the hospital, it was determined that the plaintiff had suffered a major heart attack. *Id.*

The plaintiff filed a § 1983 civil rights complaint.  The district court granted summary judgment for the defendants, concluding that the plaintiff had "failed to show that the delay in receiving medical treatment caused him any injury." *Id.* at 1210.  On appeal, the Tenth Circuit found  that the shift commander "unconstitutionally delayed [the plaintiff's] receipt of medical treatment." *Id.*

> [The plaintiff] presented general evidence that time is of the essence when someone is experiencing a heart attack.  He did not present specific medical evidence of damage to his heart resulting from the delay. Even if appellant failed to show that his heart was damaged by the delay, however, we believe he has shown that his need was sufficiently serious to require prompt medical attention.

*Id.* (footnote omitted).

> The facts . . . also demonstrate for summary judgment purposes that the shift commander knew of and disregarded the excessive risk to [the plaintiff's]

health that could result from the delay. There is evidence that [the shift commander] was informed that [the plaintiff] might be having a heart attack, and that he was present when appellant displayed symptoms consistent with a heart attack. [The shift commander] allegedly refused to drive appellant to the hospital, and told appellant not to die on his shift. [The plaintiff] has met the subjective element of the deliberate indifference test for purposes of summary judgment.

*Id.* at 1210-11.

In the present case, the Court finds Plaintiff has raised a genuine issue of material fact with respect to deliberate indifference by Nurse McGehee. He produced evidence via his declaration in opposition to Defendants' motion for summary judgment that McGehee knew he was suffering from testicular pain and an enlarged testicle, and the medical records support this fact. (Dkt. 94 at 4; Dkt. 84-2 at 9). McGehee's alleged dismissive refusal to examine Plaintiff after he advised her of these symptoms, and her failure to refute the allegation in this lawsuit, support Plaintiff's claim. Therefore, summary judgment must be denied for Defendant McGehee.

**ACCORDINGLY,** Defendants' motion for summary judgment (Dkt. 84) is GRANTED with respect to Defendants Corrections Corporation of America, Warden Wilkinson, James Sanford, Anna Newton, Ray Larimer, and E. Wornell. Summary judgment is DENIED with respect to Defendant Cynthia McGehee.

**IT IS SO ORDERED** this 26th day of March 2018.

Ronald A. White
United States District Judge
Eastern District of Oklahoma